UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 08-10385-RGS

UNITED STATES OF AMERICA

v.

PRUDENCE KANTENGWA

<u>MEMORANDUM AND ORDER ON
MOTIONS FOR DISCOVERY</u>

July 29, 2010

STEARNS, D.J.

On June 5, 2009, and November 30, 2009, Magistrate Judge Dein entered Orders
(Dkts. 35 and 73) setting the parameters limiting the scope of discovery in this case.  The
Orders dealt with five requests by defendant Prudence Kantengwa that sought production
from the government of: (1) additional documentation from the State Department's review
of Kantengwa's visa application; (2) documentation related to other visa applicants who had
completed the "Rwandan Questionnaire"; (3) documentation concerning cooperation
between the United States Government and the Government of Rwanda (including inquiries
by the Rwandan government related to Kantengwa's brother); (4) additional information as
to the existence of a roadblock (Butare) where acts of genocide are alleged to have been
witnessed by Kantengwa; and (5) the instructions of law given by the presiding Assistant
U.S. Attorney (AUSA) to the grand jury.

Magistrate Judge Dein granted Kantengwa's first request, but denied the other four.
Specifically, the government was ordered "to produce all documents comprising, referring
or relating to Kantengwa's visa application which were reviewed by all levels of State

Department personnel, which review led to the February 2002 decision that the State Department had no objection to the issuance of the Visa." June 5, 2009 Order at 8. Both sides moved for reconsideration. Both lost, and both appealed to this court. Dkts. 43 and 46.[1] The court held a hearing on the cross-appeals on September 8, 2009, gave some oral guidance to the parties, and generally took matters under advisement.[2] Subsequent motions to reconsider presented to Magistrate Judge Dein also failed. Dkts. 58 and 69.

I.   Additional Documentation Reviewed by State Department

The government's argument on the request for reconsideration is that the broad language of Magistrate Judge Dein's Order could theoretically require the production of every conceivably relevant book, article, or paper consulted by any State Department officer whose hands might have touched Kantengwa's visa file.[3] Magistrate Judge Dein sought unsuccessfully to clarify her Order in a motion hearing held on November 4, 2009: "If you're saying to me I have a book on my bookshelf about the history of Rwanda that somebody may have looked at to check the indices to see if [Kantengwa's] name was in it, maybe that's fuzzy [as to whether it must be produced]." Nov. 4, 2009 Hrg. Tr. at 77.

a.   Genocide Lists

While Kantengwa has generally asked for the "minutes" behind the review process, she has more cogently specified three lists of suspected genocidaires (genocide lists) that

---

[1]Kantengwa's appeal is labeled as an "objection" to the Order.

[2]"[S]ince everyone's unhappy, it sounds like [Magistrate Judge Dein] may have struck just the right balance in trying to resolve the dispute." Sept. 8, 2009 Hrg. Tr. at 3.

[3]The government suggests that the deliberative process privilege may be implicated, but does not formally invoke it.

were consulted by the State Department during its review of Kantengwa's visa application. The government argues that these lists are immaterial because it has stipulated that Kantengwa's name did not appear on any of the lists at the time her visa application was processed. Kantengwa responds that the absence of her name on the lists is exculpatory, and therefore <u>Brady</u> material that must be produced.[4]  <u>See</u> <u>Demjanjuk v. Petrovsky</u>, 10 F.3d 338, 350 (6th Cir. 1993) (list of prison guards at a Nazi concentration camp that did not contain defendant's name was exculpatory where the presence of other names lent credence to his defense of mistaken identity).[5]  Magistrate Judge Dein was firmly of the view that these lists fell within the scope of her Order. Nov. 4, 2009 Hrg. Tr. at 75 ("So if her name was matched to lists, concrete lists and those lists were reviewed in connection with her application they should have been produced.").

Whether the genocide lists must be produced is to some degree a function of the materiality of discovery related to the broader issue of whether what happened during Kantengwa's time in Rwanda qualified as a genocide. The government has consistently taken the position that it is not seeking to prosecute Kantengwa for war crimes. Nor does it allege that she took part in any genocidal act. Although the court has its doubts about the value of the lists to Kantengwa's defense, <u>Brady</u> issues are best not resolved by "tacking too close to the wind." <u>Kyles v. Whitley</u>, 514 U.S. 419, 439 (1995). The lists

---

[4]<u>Brady v. Maryland</u>, 373 U.S. 83 (1963).

[5]The court notes that the case for disclosure of the list in <u>Demjanjuk</u> was much more compelling than it is here. There, the list on its face supported Demjanjuk's claim of mistaken identity simply because the list appeared inclusive of those who had served as camp guards. <u>See</u> <u>Demjanjuk</u>, 10 F.3d at 351 ("Both Fedorenko and Marchenko's names appeared on the list. Demjanjuk's name did not appear.").

figured in the evaluation of Kantengwa's application, there is no heavy burden laid on the government in requiring their production, and they fall clearly within Magistrate Judge Dein's Order.[6]  The court is not dismissive of the government's concern that Kantengwa might inform other family members and MRND colleagues if their names appear on one or more of the lists.  However, the court is skeptical that any person so named is not already aware of the fact (or already the subject of a prosecution).  To the extent that the government's fear has a foundation, it may move for an appropriate protective order restricting inspection or dissemination of the lists' contents.[7]

The court does not believe that any additional clarification of Magistrate Judge Dein's Order in this respect is necessary.  The Order is specific to Kantengwa's visa application; her further request for all lists of suspected Rwandan genocidaires (including those created after her application was processed) is beyond anything that Magistrate Judge Dein authorized and is of no identified relevance.

b.    MRND Lists

In its motion for reconsideration, the government addressed a hypothetical presented by Magistrate Judge Dein with a hypothetical of its own regarding materiality."Using the example cited by the Court, if the State Department file contained

---

[6]The Government has hinted there may be issues with respect to clearances for release of these "confidential" lists.  However, that issue is not presently before the court.

[7]Some traction to the government's argument lies in Kantengwa's using of her case to fish for information that the government might possess about her brother's involvement in genocidal crimes.  Kantengwa's generalized concern about being "ambushed" at trial with undisclosed documents is misplaced.  At least one of these lists is already in the public domain. As for any ammunition the government might be holding in reserve, it is reminded of the rules regulating the flow of discovery and of the fact that they will be strictly enforced by this court.

information identifying the defendant as a member of the MRND, at a minimum, government personnel could have and likely would have done a number of things. . . . [A State Department] employee would have likely sought to determine the reliability of the list that included Kantengwa as an MRND member and whether it was sufficiently reliable to rebut Kantengwa's statement."  Dkt. 39 at 2-3.  Kantengwa understandably leapt on this hypothetical as meaning that the State Department in fact consulted such a list during the processing of her visa.  Dkt. 69 at 11-13.  Magistrate Judge Dein responded by ordering that any such list be produced.  Nov. 4, 2009 Hrg. Tr. at 61.  The government clarified at that same hearing that it was merely posing a hypothetical: "To have a list with thousands of names on it of members of the MRND is just something that we're not aware it ever existed. . . . [W]e're not aware that [Kantengwa's name] was run against an MRND list." Nov. 4, 2009 Hrg. Tr. at 67-68.  The court takes the government at its word.

     c.     Kyles Material

Kantengwa argues that Magistrate Judge Dein's Order should also be read to encompass material provided to the State Department by other government agencies that might have been used in its review of her visa application, and not just material "generated by the State Department."  See Kyles, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case.").[8]  The government acknowledges that "the U.S. Department of Justice,

_____

[8]Kantengwa also alleges "joint efforts" between the United States Government and the Government of Rwanda with regard to this case, apparently with the aim of holding the United States responsible for discoverable materials that might be in the hands of Rwandan authorities.  AUSA Chakravarty strongly denied this characterization of the relationship and stated that any cooperation was limited to the use of a conference room, access to prisoners, and answers to letters rogatory.  Assuming the Government of Rwanda will

U.S. Department of State, and Immigration and Customs Enforcement [ICE] . . . are the agencies which are involved in the investigation and prosecution of this case." Dkt. 24 at 30-31.  To the extent that Kantengwa is alluding to a possible involvement of U.S. intelligence agencies in her case, no suggestion has been made that discoverable material falling under the protections of the Classified Information Procedures Act might exist.

      d.    <u>Request for Depositions of State Department and Other Officials</u>

     In the absence of a heavily papered trail, Kantengwa requests that the court summons government representatives from all agencies that took part in the investigation "to inform the Court of that reality, under oath."[9]  As a basis for this unusual demand, Kantengwa cites Fed. R. Crim. P. 16(d)(2): "If a party fails to comply with this rule, the court may . . . enter any other order that is just under the circumstances."  Kantengwa cites no case law supporting the diversion of government officials from the work they should be doing for the purpose of swearing to things that do not exist or the existence of which they would not be expected to be aware.  As this court stated earlier in another context, "[i]n bureaucracies as large as [the Department of Defense], it is inevitable that some files will be misplaced, lost, not retained, or, in some cases, never created at all." <u>Oleskey ex rel. Boumediene v. U.S. Dep't of Def.</u>, 658 F. Supp. 2d 288, 298 (D. Mass. 2009).  The court has expressed a similar view in this case.  "There may be [no State Department policies]

---

make prisoners available to testify at trial, such cooperation does not rise to the level of a joint investigation in the <u>Kyles</u> context.  <u>See</u> <u>United States v. Reyeros</u>, 537 F.3d 270, 283 (3d Cir. 2008) ("The level of cooperation extended by the Colombian government, while admirable, appears to have been nothing more than the comity called for by treaty and custom.").

     [9]The "reality," the court presumes, is the relative dearth of Kantengwa-specific documents.

to [be had].  I mean you're looking for a precision in the operation of the government in this area.  Immigration runs more like the TSA than it does like NASA, it's – so there just may be no actual policy to find."  Jan. 28, 2010 Hrg. Tr. at 37.[10]

## II.     Results of Other Rwandan Questionnaires

Kantengwa seeks the results of other visa applications where the Rwandan Questionnaire was completed.  She cites to Fed. R. Crim. P. 16(a)(1)(E) as justifying the discovery of documents "material to preparing her defense."  Magistrate Judge Dein denied this request stating: "As evidenced by the fact that the defendant contends that both 'yes' and 'no' answers are relevant, the correlation between how an individual answered these questions and their obtaining a visa is too amorphous.  There may be any number of reasons why a specific visa was granted or denied and a review of every Rwandan's visa application has no material relevance."  June 5, 2009 Order at 8-9.  The court agrees that responses and outcomes of other Rwandan visa applications is a universe too far in the distance to have any relevance as to how Kantengwa's visa application was processed.

## III.    Joint Investigation, Interest in Kantengwa's Brother, and Vindictive Prosecution

Kantengwa seeks communications and other documents allegedly shared between the Government of Rwanda and the United States Government under a theory that her prosecution is politically motivated.  According to Kantengwa, because of these motivations, her answers on the Questionnaire were immaterial because she would have

---

[10]Defendants "remedy" would first require the court to find that there was a failure to comply with Rule 16, which requires only that the government make available documents "within [its] possession, custody, or control."  Fed. R. Crim. P. 16(a)(1)(E).  The government's attorneys have affirmed that they have turned over all that is required. Kantengwa's argument would require the court to disregard the statements of one set of officers of the court simply to satisfy the curiosities or suspicions of another.

been targeted for prosecution in any case. Magistrate Judge Dein ruled (correctly) that the government's motivation in bringing the case is irrelevant so long as a legitimate basis for prosecution exists. Cf. Whren v. United States, 517 U.S. 806, 813 (1996).

IV.    Roadblock

Counts XI-XIII of the Indictment charge Kantengwa with perjury (18 U.S.C. § 1621(1)). Count XIV charges her with obstruction of justice (18 U.S.C. § 1505), for statements that she made before the Immigration Court. Specifically, Kantengwa testified that there was no roadblock in front of the hotel where she was residing in Butare, Rwanda, from mid-April through May of 1994. The indictment alleges that multiple acts of genocide were committed by Hutu tribesmen against Tutsis at that alleged roadblock.

The government intends to prove the existence of this roadblock and Kantengwa's knowledge of it through testimonial evidence. Kantengwa seeks early disclosure of witnesses because of the difficulties involved in conducting an investigation into events that occurred sixteen years ago in Africa. The government insists that it should not be required to disclose these witnesses earlier than the twenty-one days prior to trial prescribed by Local Rule 116.2(B)(2). The government believes that earlier disclosure could endanger the safety of its witnesses, as it has in other cases linked to the Rwandan genocide. Kantengwa states that if these witnesses are not disclosed earlier, she will move for a six-month continuance when the witness list is finally provided. Magistrate Judge Dein recommended in both her Order and Status Report that there be an early as possible disclosure of witnesses.[11] But this is a matter submitted to the government's grace. The

---

[11]At the November 4, 2009 hearing, Magistrate Judge Dein indicated that she felt early disclosure was necessary because this case was unique: "I feel that you, you're, the

8

government cannot be compelled by the court to do what Congress has said it does not have to do. See Jencks Act, 18 U.S.C. § 3500.[12]

V.      Grand Jury Instructions

Kantengwa also seeks "all portions of the grand-jury proceedings reflecting the government's instructions/advice to the grand jury." Dkt. 69 at 18.  Kantengwa believes such discovery is necessary "to see whether the instructions on the law provided by these prosecutors to the grand jury were false or misleading, requiring dismissal of the indictment."   Id., citing United States v. Breslin, 916 F. Supp. 438 (E.D. Pa. 1996). Kantengwa believes such misleading instructions are plausible because of (1) the government's materiality argument using hypothetical State Department officers, and (2) because the basis of the obstruction of justice charge rests on the phrase "so-called genocide." Magistrate Judge Dein denied this specific request in its entirety.  Nov. 30, 2009 Order.  This court has previously stated that Magistrate Judge Dien ruled correctly on this

_____

parties are unable to accurately define the scope of the trial.  And, and it's an unusual case because the preparation of the defense is so hamstrung by the types of claims that are being made.  So I don't think it needs to follow the normal rules.  I don't think it's possible to."  Nov. 4, 2009 Hrg. Tr. at 84-85.  In making this finding, Magistrate Judge Dein ignored an argument by the government that this case was very similar to United States v. Boskic, 04-cr-10298-DPW (D. Mass. filed Sep. 28, 2004).  In Boskic, a visa applicant lied about his membership in the Bosnian Serb Army, which was found to have engaged in acts of genocide.  There, the government revealed its witnesses in its trial brief (Dkt. 107-3) eighteen days before trial without any findings of undue prejudice to the defendant.  While the underlying historic events are somewhat older in the present case (16 years) than in Boskic (11 years), the court does not believe that this is a significant difference.

    [12]There was also some dialogue at the November 4, 2009 hearing about rewards, promises, and inducements offered to cooperating witnesses incarcerated in Rwanda. Magistrate Judge Dein raised the topic, which does not appear in any of Kantengwa's filings. The government stated unequivocally that it had not offered any rewards, promises, or inducements, but could not speak as to the Government of Rwanda.  Nov. 4, 2009 Hrg. Tr. at 46-47.

issue. Sep. 8, 2009 Hrg. Tr. at 28.  She did.  See United States v. Lopez-Lopez, 282 F.3d

1, 9 (1st Cir. 2002).

VI.      Scope of Trial

Many heated words have been exchanged about whether the government is seeking

to convert this court into a "genocide tribunal."   Kantengwa has oddly enough painted

herself into a genocide picture, presumably in a quest to expand discovery to a magnitude

that might compel the government to throw in the towel.  Throughout five motion hearings,

the government has repeatedly stated that it will not seek to prove that Kantengwa is a

genocidaire, but rather that she made sworn false statements on a visa application and in

a related immigration proceeding about what she knew of events in Rwanda.  The subject

of the Rwandan genocide is relevant to the government's case in two limited respects: (1)

historical background, and (2) the truth of Kantengwa's statements about what she saw (or

didn't see) at the blockade at Butare.

As in the Boskic case, the government must be permitted to use expert testimony

to place Kantengwa's actions in context for a jury that is unlikely to be familiar with this

relevant and horrific chapter of Rwandan history.  The scope of this background is identified

in sufficient detail in ¶¶ 1-10 of the Indictment.  According to the government, fact witnesses

will also testify to the events at the blockade at Butare.  The government has refused to

stipulate that these witnesses will not spontaneously identify Kantengwa as a genocidaire.

Kantengwa's attorneys argue that the refusal is "proof" that the government is seeking to

convict Kantengwa of genocide.  The government responds that it cannot control what a

witness will testify to on the stand, but that it does not intend to seek out testimony

implicating Kantengwa as a genocidaire.  There is no firmer assurance that the government

10

could give.  The court accepts the government's declaration that this is a visa fraud, perjury, and obstruction case, and the court will try it as such.

Magistrate Judge Dein did believe that the government was attempting to embroider on the indictment when it filed a bill of particulars in response to her Order that pointedly identified Kantengwa's clumsy incantations of the phrase "so-called genocide" before the Immigration Court as acts of obstructing justice.  Specifically, the bill of particulars alleges that "the defendant gave false and misleading information when she refused to acknowledge that a genocide occurred in Rwanda between April and July 1994, but instead characterized the killing of hundreds of thousands of Tutsis as a 'so-called genocide,' and stated that there were 'massacres' where 'Hutus killed Tutsis and Tutsis killed Hutus.'" Dkt. 42 at 3-4.  The government contends this "misleading" statement was "intended to put the Defendant's false answers and her description of her personal circumstances in a different light and a different context, than would a truthful and accurate recitation of the facts, or characterization of events."  Dkt. 62 at 2.  Magistrate Judge Dein believed that  "this additional statement significantly broadened the purported scope of the trial beyond that previously represented to the court, *i.e.* the accuracy of answers to straightforward questions in Ms. Kantengwa's immigration application."  Nov. 30, 2009 Order at 2.

This court disagrees.  The bill of particulars does not convert the obstruction count into one for genocide (or genocide denial), and if it did, it would amount to an impermissible constructive amendment of the indictment.[13]  See United States v. Dunn, 758 F.2d 30, 35 (1st Cir. 1985).  Properly read, the bill attempts to explain why certain statements that

---

[13]The bill of particulars does not allege acts by Kantengwa in 1994 that would fall within any definition of genocide that is sanctioned by international law.

11

Kantengwa made to the Immigration Court were included in the indictment, presumably on the theory that, despite what she testified to, Kantengwa secretly believed that the events she had witnessed were in fact genocidal.  This inquiry may lead the government down an ill-conceived out path as it attempts to flush out a definition of "genocide," and then attempts to prove that its definition matches the one that Kantengwa had in mind at the time she testified.  This is no easy task as the law does not hold a defendant accountable for statements that she in good faith believes are true, no matter how wildly wrong she may be.  See United States v. Slawick, 548 F.2d 75, 84, 87 (3d Cir. 1977).[14]

ORDER

For the foregoing reasons, the motions to reconsider are ALLOWED in part and DENIED in part consistent with the body of the Memorandum.  The Clerk will return the case to Magistrate Judge Dein for any further pre-trial discovery disputes or matters necessary to bring the case expeditiously to trial.

SO ORDERED.

/s/ Richard G. Stearns

_____

_____

[14]Kantengwa has also drawn the court's attention to congressional testimony by the head of ICE, Assistant Secretary of Homeland Security John Morton, on October 6, 2009. In Morton's prepared remarks, he stated: "More recently, ICE traveled to Kigali, Rwanda to investigate Prudence Kantengwa, an individual suspected of inciting and assisting in the 1994 Rwandan genocide.  In December 2008, ICE's investigation resulted in a 15-count indictment in the District of Massachusetts against Kantengwa . . . ."  No Safe Haven: Accountability for Human Rights Violators, Part II: Hearing Before the Subcomm. on Human Rights and the Law of the S. Comm. on the Judiciary, 111th Cong. 6 (2009) (statement of John Morton, Asst. Sec'y of Homeland Sec.) (emphasis added), available at http://judiciary.senate.gov/pdf/10-06-09%20Morton%20Testimony.pdf.  The government has given explicit assurances that Secretary Morton's legal and factual judgments are not reflected "within the four corners of the indictment."  Nov. 4, 2009 Hrg. Tr. at 23.

UNITED STATES DISTRICT JUDGE